1                    UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF WASHINGTON

3    ─────────────────────────────────────────────────────────

     STEVEN BASSETT,                    )
4    individually, and on behalf        )
     of all others similarly           )
5    situated,                          )
                                        )  Appeal No. 16-35933
6             Plaintiff,                )  No. 2:16-cv-00947-TSZ
                                        )
7         vs.                           )  Seattle, WA
                                        )
8    ABM PARKING SERVICES, INC.         )
     (d/b/a "Ampco System              )
9    Parking" and "ABM Onsite          )
     Services – West"), ABM            )
10   ONSITE SERVICES – WEST,           )
     INC., and ABM INDUSTRIES,         )
11   INC.,                              )
                                        )  Motion Hearing
12            Defendants.               )  October 13, 2016
13   ─────────────────────────────────────────────────────────

     AMANDA DOUGHERTY,                  )
14   individually and as a             )
     representative of the class,      )
15                                      )
              Plaintiff,                )  No. 2:15-cv-01501-TSZ
16                                      )
          vs.                           )  Seattle, WA
17                                      )
     BARRETT BUSINESS SERVICES,        )
18   INC.,                              )
                                        )  Motion Hearing
19            Defendants.               )  October 13, 2016
20   ─────────────────────────────────────────────────────────

21

22

23

24

25

```
 1   SARAH CONNOLLY,              )
     individually and on behalf  )
 2   of all others similarly     )
     situated,                   )
 3                               )
             Plaintiff,          )   No. 2:15-cv-0517-TSZ
 4                               )
         vs.                     )   Seattle, WA
 5                               )
     UMPQUA BANK,                )
 6                               )   Motion Hearing
             Defendants.         )   October 13, 2016
 7   _____

 8                   VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE JUDGE THOMAS S. ZILLY
 9                   UNITED STATES DISTRICT COURT
     _____

10

11   APPEARANCES:

12   FOR PLAINTIFF BASSETT:   CHRISTOPHER ERIC LOVE
                              Pfau Cochran Vertetis Amala PLLC
13                            911 Pacific Avenue, Suite 200
                              Tacoma, WA 98402
14                            chris@pcvalaw.com

15   FOR PLAINTIFFS
     CONNOLLY AND DOUGHERTY:  E. MICHELLE DRAKE
16                            Berger & Montague, P.C.
                              43 SE Main Street, Suite 505
17                            Minneapolis, MN 55414
                              emdrake@bm.net
18
     FOR DEFENDANT ABM:       ABRAHAM K. LORBER
19                            Lane Powell PC
                              1420 Fifth Avenue, Suite 4200
20                            Seattle, WA 98111-9402
                              lorbera@lanepowell.com
21
     FOR DEFENDANT BBSI:      JOSEPH VANCE
22                            Miller Nash Graham & Dunn LLP
                              500 Broadway, Suite 400
23                            PO Box 694
                              Vancouver, WA 98660
24                            joseph.vance@millernash.com

25
```

```
 1    FOR DEFENDANT UMPQUA:    JAMES E. HOWARD
                              Davis Wright Tremaine
 2                            1201 Third Avenue, Suite 2200
                              Seattle, WA 98101-3045
 3                            jimhoward@dwt.com

 4
      Andrea Ramirez, CRR, RPR
 5    Official Court Reporter
      United States District Court
 6    Western District of Washington
      700 Stewart Street, Suite 17205
 7    Seattle, WA 98101
      andrea_ramirez@wawd.uscourts.gov
 8
      Reported by stenotype, transcribed by computer
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Motion Hearing — 10/13/16

```
 1              THE COURT:  Will the clerk please call the calendar?
 2              THE CLERK:  Thank you, Your Honor.  I'll be calling
 3    three cases.  I'll start with the Bassett case, CV16-947Z,
 4    Steven Bassett vs. ABM Parking Services, et al.
 5         Counsel, please stand and make your appearance for the
 6    record.
 7              MR. LOVE:  Good morning, Your Honor.  May it please
 8    the Court, Chris Love here, for Plaintiff Steven Bassett.
 9              THE COURT:  Good morning, Mr. Love.
10              MR. LORBER:  Good morning, Your Honor.  Abraham
11    Lorber of Lane Powell, for Defendant ABM Parking Services.
12              THE COURT:  Good morning.
13         Please call the next matter on the calendar.
14              THE CLERK:  Thank you, Your Honor.  Case number
15    CV15-1501Z, Amanda Dougherty vs. Bassett Business Services.
16         Counsel, please stand and make your appearance for the
17    record.
18              MS. DRAKE:  Good morning, Your Honor.  Michelle
19    Drake, on behalf of Plaintiff Dougherty.
20              THE COURT:  Good morning.
21              MR. VANCE:  Good morning, Your Honor.  Joseph Vance,
22    with Miller Nash Graham and Dunn, on behalf of the defendant,
23    BBSI.
24              THE COURT:  Good morning.
25              THE CLERK:  And the next case, Your Honor, is
```

Motion Hearing – 10/13/16

1   CV15-517Z, Sarah Connolly vs. Umpqua Bank, et al.

2        Counsel, please stand and make your appearance.

3        MS. DRAKE:  Your Honor, Michelle Drake, again.  I'm

4   also appearing on behalf of Ms. Connolly.

5        THE COURT:  Good morning, again.

6        MS. DRAKE:  Thank you.

7        MR. HOWARD:  Your Honor, Jim Howard, on behalf of

8   Defendant Umpqua Bank.  And I have here with me Andy Hannon,

9   in-house counsel for Umpqua Bank.

10        THE COURT:  All right.  Well, this is a rather

11   unusual hearing, because there are three cases which I have

12   brought together for this hearing.  The Court entered a minute

13   order a few weeks ago, setting this time and place for

14   argument.  And I indicated that all three of these cases arise

15   in the context of a motion to dismiss on the pleadings,

16   although for different -- I think there's a 12(b)(6) motion,

17   there's a 12(b)(1) motion, there's a 12(b)(3) motion.  But they

18   all raise the *Spokeo* issue of what constitutes -- what type of

19   statutory violation will confer Article III standing.

20        I felt it was appropriate that I allow all of you to argue

21   at the same time, basically, because what I might do in one

22   case might affect what I would do in the other case, because

23   they are similar in nature, and that is trying to come to grips

24   with the fallout from *Spokeo*, and what, in fact, constitutes

25   Article III standing post-*Spokeo*.

Motion Hearing – 10/13/16

1    As the lawyers probably know, there have been five

2    circuits that have dealt with this issue, and we have a

3    three-to-two split in the circuits.  Perhaps the lawyers will

4    be talking about some of those circuit decisions.  We have

5    probably 30-plus district court decisions that are published.

6    And as you might expect, they're about evenly divided in terms

7    of what is necessary to constitute standing.

8    I put on the counsel tables two decisions from Judge

9    Coughenour that were issued in the last week.  I believe

10   plaintiff's counsel in Bassett was involved in one of the

11   cases, and I'm not sure whether one of the defendants was also

12   involved.  I don't put that out there as what should be the

13   law, or that the Court has made a decision, but only because

14   they were issued within the last few days.  I wanted everyone

15   to have the benefit of those decisions.

16   What I'd like to do this morning is first hear argument in

17   the Bassett case.  And I'm going to suggest 15 minutes a side.

18   Then we'll proceed, and I'd like to hear argument in the other

19   two cases together, because the other two cases essentially

20   deal with the application process in connection with getting a

21   job, and whether or not the Fair Credit Reporting Act, which

22   requires disclosures be made in a document solely for the --

23   consisting solely of the disclosure -- same issue really --

24   constitutes a violation of the Fair Credit Reporting Act.

25   Because the issue is essentially the same, the facts are a

Motion Hearing - 10/13/16

1    little different -- but what I'd like, and propose, is that the

2    defendants, the moving parties, go first, and that each

3    defendant counsel have ten minutes.  And then we'll allow the

4    plaintiff to have a total of 20 minutes in rebuttal, or in

5    response to the motions.

6         So if you're ready to proceed, let's proceed with the

7    Bassett argument.

8              MR. LORBER:  Good morning again, Your Honor.  Abraham

9    Lorber, of Lane Powell, for the defendant in the Bassett case,

10   ABM Parking Services.

11        This is our motion to dismiss pursuant to FRCP 12(b)(6).

12   And in our motion, we have multiple bases for dismissal.  But

13   pursuant to the Court's order and comments this morning, I'm

14   going to confine my remarks to Article III standing.

15             THE COURT:  Well, Judge Coughenour did address the

16   issue that was raised in one of the cases dealing with whether

17   this is a 12(b)(6) motion or a 12(b)(1) motion.  And basically,

18   he said the same standard applies.  I think I agree with that.

19   So unless lawyers have a different view, don't spend much time

20   on the nature of the motion, but rather what is standing under

21   *Spokeo*.

22             MR. LORBER:  Thank you, Your Honor.

23        So as the Court is aware, standing has three elements.

24   The element at issue here is the first element, which is injury

25   in fact.  And the plaintiff, at the Rule 12 stage, bears the

Motion Hearing – 10/13/16

1  burden of alleging facts sufficient to support a finding that

2  there's an injury in fact.

3      To constitute an injury in fact, under *Spokeo* and prior

4  cases by the Supreme Court, there needs to be a concrete and

5  particularized harm that is actual and imminent, but not

6  conjectural or hypothetical.

7      Here, we do not dispute that Mr. Bassett has alleged a

8  particularized harm.  It was his credit card receipt that was

9  printed.  However, we most vigorously dispute the concreteness

10  element.  And because Mr. Bassett has not alleged facts that

11  support a concrete injury, his injury is hypothetical and

12  conjectural, and is legally deficient.

13      THE COURT:  What did Bassett allege is his injury in

14  the Complaint?

15      MR. LORBER:  So it's very sparse, Your Honor.  It's a

16  bare-faced pleading that he received the receipt that contained

17  the expiration date, and that he was harmed thereby.  There's

18  some other allegation that is give us the date and time that he

19  received the receipt.  But as far as injury is concerned, he

20  received the receipt with an expiration date and was harmed

21  thereby.

22      THE COURT:  Well, let me read you specifically what

23  Bassett alleged.  Paragraph 113 of the Complaint alleges that

24  it caused -- as a result of this receipt, causing an imminent

25  risk that plaintiff's valuable property would be stolen and/or

1    misused by identity theft, or thieves.  I think that's
2    basically the allegation.
3        How does that compare to the allegation contained in the
4    *Byles* case decided by Judge Coughenour recently?
5            MR. LORBER:  Well, Your Honor, both the *Byles* case
6    and our case here were filed by my colleagues.  And our
7    understanding is that the Complaints are functionally
8    identical.  Both involve a pay-for-parking garage, located here
9    in the metro Seattle area, and both involve the printing of a
10   receipt with only a credit card expiration date.  Those are the
11   allegations that we have.
12       Understood, the allegations the Court references in
13   Paragraph 113, but we would submit that that simply restates
14   the harm that the statute is trying to protect against, and
15   does not provide case -- any case-specific allegations that
16   would support a finding of concreteness.
17           THE COURT:  Well, didn't Congress say that if you
18   violate this statute, you have a claim, you have a cause of
19   action?  Isn't that the end of the story?
20           MR. LORBER:  It is not, Your Honor.  And it's not,
21   for a separation-of-powers reason.
22       As the Court explained in *Spokeo*, Congress has the right
23   to create a cause of action where none existed before.  In this
24   context, it may be that before the FACTA, a plaintiff who did
25   suffer identity theft, by virtue of their credit card

1    information being published, would not have a cause of action,

2    because there was no case law to support it.

3        But what the Court makes clear in *Spokeo* is that Congress

4    cannot usurp the Court's jurisdiction as far as it relates to

5    Article III.  Congress cannot satisfy the Article III minimum

6    simply by passing a law.  They can create a new cause of

7    action, as they did with FACTA, but they can't say a harm

8    exists where none existed before.  And so even with Congress's

9    passing of FACTA, it's incumbent upon a plaintiff, such as

10   Mr. Bassett, to allege, at the Rule 12 stage, a concrete

11   injury.

12       The reason he did not allege a concrete injury -- there's

13   two reasons.  The first is the issue of disclosure.  The way

14   that this statute works, it's fairly obvious that this statute

15   is designed to prevent the unauthorized disclosure of credit

16   card information.  And in this case, although we have a quite

17   lengthy complaint that deals a lot with the statutory history

18   of FACTA, we don't have any information that the credit card

19   receipt, with its information, was actually disclosed.  All we

20   have is that the receipt was printed.  And the implication, at

21   least from the Complaint, is that Mr. Bassett kept the receipt

22   until he handed it over to his attorneys.  In keeping the

23   receipt, Mr. Bassett would have been in possession of the

24   information that the receipt retained, just like he would be in

25   possession of his credit card in his wallet, that contains all

Motion Hearing - 10/13/16

1    of the information for a credit card.  And so without actual

2    disclosure of the information, the harm that FACTA is designed

3    to prevent never manifests itself.  And so that is the primary

4    basis for dismissal that's argued in our motion.

5        After we filed our motion, we had the benefit of Judge

6    Coughenour's rulings in the *Byles* and *Israel* case.  And in

7    those cases, what Judge --

8            THE COURT:  Hold your voice down a little bit.  The

9    microphone system works really well.

10           MR. LORBER:  Thank you, Your Honor.

11       In both of those cases, Judge Coughenour explained that

12   even if there was disclosure of the sort of information that's

13   at issue here, it could not create a risk of harm.  And Judge

14   Coughenour goes through the congressional findings, and the

15   history of FACTA, and the pronouncements regarding the

16   potential harm, and found that even if a hacker or identity

17   thief had possession of Mr. Bassett's receipt with its

18   expiration date, they would not be able to steal his identity.

19           THE COURT:  All right.  Well, I understand you like

20   Judge Coughenour's decision.  It seems fairly close to the

21   facts here.  But let's leave Judge Coughenour's rulings.

22       Haven't two circuits essentially said there would be

23   standing under these kinds of facts?  Haven't at least 10 or 12

24   district courts said there would be standing under these kinds

25   of facts?

1          MR. LORBER:  Well, Your Honor, I'm not -- so I have

2     the FACTA cases that we've cited and that the plaintiffs have

3     cited.  And none of those FACTA cases that we've had the

4     opportunity to review -- FACTA cases, that is -- deal with

5     these particular facts.  And I'd like to distinguish this case

6     from the *Wood vs. Jimmy Choo* decision that the plaintiffs cited

7     in their supplement authority.

8          So in *Wood vs. Jimmy Choo*, the plaintiff received a

9     receipt that contained the expiration date in addition to a

10    host of additional identifying information, such as name and

11    address, that is not alleged in this case.  Additionally, in

12    the *Wood vs. Jimmy Choo* case, the disclosure of the receipt

13    occurred in what we refer to in our brief as sort of the

14    classic point-of-sale situation, which is, it was at a Sunglass

15    Hut in a shopping mall.  So in those situations, there's two

16    receipts, traditionally.  There's one for the plaintiff, and

17    there's one that's retained by the merchant, that has the

18    information on it.  And so --

19         THE COURT:  Doesn't -- when I go to the parking

20    garage and get my receipt, doesn't the parking company have a

21    record of the same receipt?

22         MR. LORBER:  The parking company -- Your Honor, that

23    information is not in this record.  And I can answer that if

24    there's additional -- the record is supplemented at some later

25    point in the case, it will be clear that that is not the case

Motion Hearing — 10/13/16

1    in this parking garage.  But since this is a Rule 12 motion,

2    and we have to use the allegations in the Complaint, all we had

3    is that one receipt was printed.  There's no allegation of a

4    second receipt that was retained by anyone other than

5    Mr. Bassett or his attorneys.

6         And so Your Honor, I would focus on the FACTA cases that

7    have come out since *Spokeo*.  We have Judge Coughenour, in *Byles*

8    and *Israel*.  We also have the *Wood* case.  We would submit that

9    the *Wood* case is distinguishable.  Judge Coughenour -- and I

10   know you don't want me to rely on Judge Coughenour too much,

11   but he did thoroughly distinguish the *Wood* case in his decision

12   on *Byles*.

13        And the specific factual scenario, we would submit, is

14   what's important here.  There is no allegation of the second

15   receipt.  There is no allegation, as is discussed in the

16   *Andrade* and *Shlahtichman* cases that are also cited by the

17   plaintiff, of the receipt being mislaid, or copied, or someone

18   looking over the plaintiff's shoulder.  That could happen.

19   We're not saying that that's impossible, that there could never

20   be a violation.  What we're saying is that in this case, given

21   the stage that we're at, the plaintiff bears the burden of

22   alleging some sort of disclosure of this receipt to a third

23   party.  And the Complaint, for all its length, is devoid of any

24   such allegation.

25             THE COURT:  Well, if I were to proceed along the

Motion Hearing – 10/13/16

1   lines you argue, would the dismissal have to be without

2   prejudice and with leave to amend?

3          MR. LORBER:  So obviously, we would prefer dismissal

4   with prejudice.

5          THE COURT:  I know what you'd prefer but --

6          MR. LORBER:  Given our alternative requests in our

7   motion for a more definite statement, and Judge Coughenour's

8   decisions in *Byles* and *Israel* where he dismissed without

9   prejudice, we would anticipate that if the Court agreed with

10  us, it would also dismiss without prejudice.  We strongly

11  suspect that if the plaintiffs were to then file an amended

12  complaint, it would be similarly deficient, because there

13  simply was no disclosure.  But we certainly understand that at

14  least the trend in this district appears to be dismissal of

15  these cases without prejudice.

16         THE COURT:  Well, at least the trend in Judge

17  Coughenour's court.

18         MR. LORBER:  Yes, Your Honor.

19     Unless the Court has any further questions, that pretty

20  much sums up our argument.  To repeat, there was no disclosure

21  of this information to any third party; and thus, the potential

22  harm never manifested.  And even if there was disclosure, the

23  information that was disclosed cannot lead to identity theft,

24  as explained by Judge Coughenour in the *Byles* and *Israel* cases.

25         Thank you.

Motion Hearing – 10/13/16

1          THE COURT:  Thank you.

2          MR. LOVE:  Good morning, again.  May it please the

3    Court, Chris Love, of Pfau Cochran Vertetis Amala, here on

4    behalf of Plaintiff Steven Bassett.

5          Keeping the Court's remarks in mind about the standard of

6    review on the motion, I'll be brief.  Our only real dispute is

7    whether the *Iqbal/Twombly* plausibility standard applies in this

8    case.  As the Ninth Circuit stated in the *Maya* case, that

9    standard, that portion of the 12(b)(6) standard, is

10   inappropriate for a motion to dismiss premised on standing,

11   because it involves consideration of the merits of the case.

12   As the Ninth Circuit said in *Maya*, the question of standing

13   precedes and does not require analysis of the merits.

14   Otherwise, we do agree that --

15          THE COURT:  Judge Coughenour did deal with that very

16   argument in Footnote 1; did he not?

17          MR. LOVE:  He did state that some of the 12(b)(6)

18   standard applies, taking all allegations as true and construing

19   all inferences in the manner most favorable to plaintiffs.  And

20   we don't dispute that, Your Honor.  We agree with that portion.

21   To the extent that Judge Coughenour's opinion was based on

22   application of the plausibility standard, we object to that.

23          Regarding the substance of the case, Plaintiff Bassett's

24   standing to sue, we obviously disagree with the defendants on

25   what the Supreme Court stated in *Spokeo*.  There was really no

Motion Hearing - 10/13/16

 1    new ground broken there.  It was merely a reaffirmation of

 2    longstanding principles regarding standing.  The *Spokeo* court

 3    reaffirmed that Congress does have the power to identify and

 4    elevate injuries and harms to a legally cognizable status.

 5    They reaffirmed that Congress is well-positioned, direct quote

 6    from the case, "to identify especially intangible harms and to

 7    identify and articulate chains of causation that lead to those

 8    harms."

 9        *Spokeo* expressly instructs courts to defer to

10    congressional judgment, is important and instructive, drawing

11    on past Supreme Court precedent, such as the *City of Boerne*

12    case.  Congressional findings of harm such as this are entitled

13    to substantial deference, because Congress's function within

14    our system of government is to perform these extensive

15    fact-finding processes that a court simply can't perform.

16            THE COURT:  Well, did *Spokeo* court indicate that a

17    procedural violation alone might or might not be -- provide

18    standing?  I mean, they indicated that there would be some

19    procedural violations where no standing would occur and more

20    concrete injury is necessary.

21        Do you agree with that?

22            MR. LOVE:  We do, Your Honor.

23            THE COURT:  And your allegation -- I referred earlier

24    to Paragraph 113.  If there's other allegations in your

25    Complaint you wish me to look at, I will.  But you alleged that

Motion Hearing - 10/13/16

1    the fact that there was an expired -- there was an expiration

2    date on the receipt itself caused imminent risk that

3    plaintiff's valuable property would be stolen and/or misused by

4    identity thieves.  I believe that's your language.  That's just

5    a pure possibility that this violation might cause that damage

6    in the future.

7         Is that kind of where you are?

8         MR. LOVE:  And I believe Your Honor properly

9    characterizes it.  The harm we are alleging is that printing an

10   expiration date on a receipt causes this risk of identity

11   theft.  And that is the precise risk that Congress sought to

12   address through FACTA's truncation requirements.  The

13   congressional record is replete with references, over and over,

14   saying that the purpose of these truncation requirements is to

15   limit opportunities -- not to limit actual disclosures, the

16   defendants claim -- but to limit opportunities for sensitive

17   card information to be picked off by identity thieves.

18        THE COURT:  But what's the difference between that

19   and the zip code, that the Supreme Court in *Spokeo* suggested

20   would not be -- give rise to standing?

21        MR. LOVE:  In our view, Your Honor, before FACTA was

22   enacted, Congress had extensive hearings on the explosive

23   growth of identity theft, its causes, the numbers, millions of

24   consumers affected, and ways to stem the tide of this growing

25   crime.  And within this specific congressional record, based on

Motion Hearing – 10/13/16

1   those facts, Congress identified that there was a real risk of

2   harm.  A direct quote from --

3       THE COURT:  There's no question that Congress

4   identified the real risk.  The question is whether you have

5   alleged the concrete injury under *Spokeo*.

6       Tell me, do you have any circuit or district court

7   decisions in *Spokeo* that would favor your position today?

8       MR. LOVE:  Post-*Spokeo*, we are not aware of a case.

9   I would, however, point to *Spokeo* itself, where the Supreme

10  Court reaffirmed, again, a direct quote, "that a real risk of

11  harm is sufficient to constitute a concrete injury in fact."

12  And that is what Congress recognized in enacting the truncation

13  requirements.  There is a real risk of harm.

14      THE COURT:  Let me ask you this.  If given an

15  opportunity to amend, do you know of any facts that would allow

16  you to provide us with any other injury alleged to have

17  occurred for your plaintiff in Bassett?

18      MR. LOVE:  Your Honor, I believe the injury would be

19  confined to the printing of the expiration date.

20      We do allege on our complaint that Plaintiff Bassett

21  received this receipt from a kiosk near the elevators in the

22  building he was in.  And this creates an additional opportunity

23  for what's called in the security circles "shoulder surfing,"

24  where someone standing behind the plaintiff could potentially

25  see the receipt and pick off information from it.

Motion Hearing – 10/13/16

1    THE COURT:  Do you know of any facts in your case

2    that would allow you, given Rule 11, to allege any additional

3    injury, other than what you've alleged?

4    MR. LOVE:  Not on current investigation, Your Honor.

5    THE COURT:  So if I were to grant the motion to

6    dismiss, would it be with prejudice?

7    MR. LOVE:  Unfortunately, I would have to agree with

8    Your Honor.  Our position is that the risk of harm created in

9    printing the expiration date on the receipt is sufficiently

10   concrete.

11   THE COURT:  All right.  I think I understand your

12   position.  Thank you.

13   I'm –– unless you've got further arguments, I mean ––

14   MR. LOVE:  Just simply, I want to direct the Court's

15   attention to the *Wood* opinion, which was provided in the notice

16   of additional authority.  Defense counsel also addresses the ––

17   Judge Coughenour.

18   The attempt to distinguish the *Wood* opinion on its facts

19   is simply unavailing.  The *Wood* court did not rely on those

20   additional facts in reaching its opinion.  It relied simply on

21   the fact that an expiration date was printed on the receipt.

22   That was the key fact in that analysis.  In fact, it was the

23   only fact on which that analysis hinged.

24   THE COURT:  Well, but the Court –– I have the opinion

25   right here.  It does say in the facts that *Wood* alleges that

1    *Jimmy Choo* willfully violated FACTA by issuing a sales receipt

2    with the expiration date.  The receipt also contained other

3    sensitive information about plaintiff, including her home

4    address, telephone number, and name of the salesperson that

5    conducted the transaction.  And then it also had the last four

6    digits of the credit card, which is permitted.  As a

7    consequence, the claim -- the complaint claims that each class

8    member has been burdened with an elevated risk of identity

9    theft.

10        Now, that's a little different -- those facts are a little

11    different than your facts; aren't they?

12            MR. LOVE:  We do acknowledge that, Your Honor, but

13    our position is that it's a distinction without a difference.

14    Because when you proceed to the analysis of standing in the

15    *Wood* opinion, those additional items that are on the receipt

16    aren't mentioned.  The only fact that's mentioned is that that

17    expiration date was printed on the receipt.

18            THE COURT:  You know, the *Wood* case also makes a leap

19    of faith which I think the Eleventh Circuit has made, and that

20    is that this is a substantive violation, as opposed to a

21    procedural violation.  Because the *Wood* court states that

22    through FACTA, Congress created a substantive legal right for

23    *Wood*, and other card-holding consumers, to have their receipts

24    truncated with just specific information.

25        Once you have a substantive right, if it is a substantive

1    right, then that's a little different.  I think maybe it's only

2    the Eleventh Circuit that has described, in a different

3    context, this as being a substantive right.

4        If this is a substantive right, your claim, then, isn't

5    any -- any violation of FACTA a substantive right?

6            MR. LOVE:  As far as the truncation requirements go,

7    we would agree, Your Honor.  But that is premised on the fact

8    that it's not simply a situation where Congress has created a

9    statute saying, "Don't do this," and there are no congressional

10   findings, no congressional exploration of an underlying harm.

11   An example would be if Congress created a statute stating, "No

12   commercial mailers shall be sent to consumers, that use the

13   color orange."  There can't be any conceivable harm there.

14   There would be no congressional findings that there was any

15   harm that motivated enactment of that statute, a harm that was

16   being elevated to a legally cognizable status.

17       FACTA is completely different.  The record is clear that

18   there were extensive hearings on the problem of identity theft.

19   And ultimately, the truncation requirements, this substantive

20   right, as the *Wood* court in the Eleventh Circuit found, weren't

21   the solution to that harm.

22           THE COURT:  All right.  I think I understand your

23   position.  Unfortunately for you, I don't agree with it.  I am

24   going to grant the motion to dismiss in Bassett.  I believe

25   that the -- you can sit down.  I'm not going to issue a formal

1    order, other than what I say here today.  But basically, the

2    harm that is alleged here is strictly a procedural violation of

3    the statute where –– nothing more than a potential risk of some

4    harm in the future.  As I indicated, the complaint only alleges

5    risk that plaintiff's rights, or property rights, would be

6    stolen, nothing more.

7        The case is almost identical to the ruling by Judge

8    Coughenour in *Byles vs*, *Ace Parking Management*, Docket

9    Number 24, filed in case Number 16-0834.  Judge Coughenour also

10   had a second case, which was filed two days ago, on the same

11   precise issue and –– in *Israel vs. Diamond Parking Services*,

12   Docket Number 23.  Again, the reasoning is the same.

13       *Spokeo*, for all its uncertainty in terms of what it means,

14   because the circuit courts and the district courts have, in

15   other contexts –– we're going to get to that in a few

16   minutes –– have struggled with exactly what constitutes some

17   sort of concrete injury necessary to have Article III standing.

18   But I think it is clear that *Spokeo* said that not every

19   procedural violation gives rise to standing.  Something more is

20   necessary.

21       Plaintiff has failed to articulate, in the pleadings here

22   in Bassett, anything more than a pure possible violation, or

23   possible risk of theft.  And I'm satisfied that under those

24   circumstances, the Court must, and does, dismiss, and, I

25   believe, with prejudice.  I appreciate counsel's candid remarks

1    with respect to what he could or could not allege.  I think

2    he's alleged everything that he believes is appropriate.  Given

3    those circumstances, the dismissal must be with prejudice.

4    We'll enter a judgment accordingly in the next day or two.

5        I thank the lawyers for their participation in the hearing

6    connected with that issue in Bassett, and we'll now -- those

7    lawyers are free to leave, if you'd like.  It's always good to

8    leave when you win, and even when you lose.  You're welcome to

9    stay or leave, as you wish, Counsel.

10       It's an interesting issue.  But I think this particular

11   issue is fairly clear, and I have no reluctance to rule from

12   the bench, as I have done.

13       So thank you for your arguments and your briefs, and

14   you're excused, if you wish.

15            MR. LORBER:  Thank you, Your Honor.

16            MR. LOVE:  Thank you, Your Honor.

17            THE COURT:  Well, let's proceed with the next

18   arguments.

19       There's a similarity here, and I know that the defense

20   counsel is different in the Connolly and Dougherty cases.

21   Plaintiff's counsel is the same.  So what I've suggested is not

22   more than 20 minutes.  And hopefully, you can divide up your

23   time.  But the issues are essentially similar in these two

24   cases, but different from the case that we've just heard

25   argument on.

Motion Hearing - 10/13/16

1      So go ahead, Counsel.

2          MR. HOWARD:  Thank you, Your Honor.  Jim Howard, on

3    behalf of Defendant Umpqua Bank, Case 2:15-cv-00517.

4      Your Honor, I think the Court is right to refer to *Spokeo*.

5    And I'd like to at least start there, briefly, because I think

6    it gives us some context to what we're all here talking about

7    and what the courts across the country are wrestling with.

8      I think what's helpful for our argument is*, Spokeo* was an

9    FCRA case, so it involved an entity that the Court presumed was

10   a consumer reporting agency.  They aggregated information on a

11   website.  Some of it was displayed.  If you go to the website

12   and type in someone's name --

13         THE COURT:  Well, what's happened to *Spokeo*?  I know

14   the Ninth Circuit got it back, but what has happened, if you

15   know?

16         MR. HOWARD:  I do know, because I checked, Your

17   Honor.  I had the same question myself.  It is set for argument

18   in December, so we may have further guidance on how the Ninth

19   Circuit decides to deal with *Spokeo* at that time.  But I don't

20   know how long it will take before an opinion might then be

21   issued.  So it could be some time.

22     Obviously, in the meantime, district courts have to

23   wrestle with, well, what do you do?

24         THE COURT:  Well, and they've been pretty much

25   divided; haven't they?  I mean, the plaintiff relies heavily on

Motion Hearing - 10/13/16

1   the *Thomas* decision, which is a very thoughtful district court

2   opinion.

3       What do you think about that opinion?

4       MR. HOWARD:  Your Honor, I think that *Thomas* is a

5   different case, and also that Thomas makes some mistakes in the

6   analysis on how it goes about analyzing the issues.

7       I think probably it's important to realize that *Thomas* had

8   already had a summary judgment motion that was denied; then

9   there was a class certification motion, which was granted.  And

10  the case was very far along, then, at the point in time when

11  this *Spokeo* issue arose.

12      The Court then is faced with deciding what to do with a

13  case that all the parties and the Court itself had put a lot of

14  resources into.  I think sometimes that influences the

15  analysis.  But it was -- it's a fairly long opinion.  But where

16  the Court, I feel like, goes wrong is at two points.  Or maybe

17  I should say it this way:  There's two reasons why I don't

18  think it governs the outcome in this case.

19      One is, it was a different scenario.  There were

20  allegations in that case that the actual, kind of, core purpose

21  of the statute had been violated; in other words, that the

22  individual at issue had been denied employment because of an

23  essentially secret background check that had been run; that he

24  didn't know anything about that until after the fact; and that

25  there were quite a number of errors in that report.  That's a

Motion Hearing - 10/13/16

1  very different situation than a purely procedural error, if you

2  will, where there is a quibble about some particular

3  requirement the statute has that maybe wasn't followed

4  procedurally.

5            THE COURT:  Well, it's not a quibble.  The statute

6  says you do it one way, with a sole document, and they didn't

7  do it that way.  They had a release in the same document; did

8  they not?  It's clearly at least a procedural violation; do you

9  agree?

10           MR. HOWARD:  Agreed there, Your Honor.

11           THE COURT:  All right.  And this was what Congress

12 was attempting to eliminate by passing these laws.

13     Why isn't this a violation that rises to the level of

14 Article III standing?

15           MR. LOVE:  Your Honor, I would say, first of all --

16 I'm not sure I can get rid of the yellow markings.

17           THE COURT:  So why don't you take just a moment and

18 just capsulize the facts here that give rise to this claim.

19           MR. HOWARD:  I will, Your Honor.

20     What we have here, Congress -- if you look at the

21 congressional history, the purpose of passing the FCRA was,

22 there was a concern that -- there was a growing amount of data

23 out there about counterfeiting.  And that data was accessible

24 to companies and other -- really anyone that wanted to run a

25 background check on someone.  And so the law was passed to make

1    sure that people had notice that that was taking place, and an

2    opportunity then, if the report was issued, to request a copy

3    of it.

4         All those things that the statutes intended to address,

5    are indisputably satisfied here.  This is the form that was

6    used.  It says, "Disclosure and Authorization Regarding

7    Procurement of Background Reports," in caps, at the top of the

8    form.  Umpqua Bank, due to the regulations it operates under,

9    has to run background checks on anybody that it hires at the

10   bank.  This is a requirement under federal law, under the FDIC

11   Act, and the SAFE Act, as well.  So they don't have a choice.

12   They have to run a background check on everybody, if they're

13   going to consider employing them at the bank, because of the

14   sensitive nature of working at a bank.

15        There's no dispute, that plaintiff has raised, that she

16   got the form.  There's no dispute that she didn't understand

17   the form.  She hasn't raised any allegations that she was

18   somehow tricked, that this isn't her signature, that she didn't

19   understand it was a background check.  It's apparent, if you

20   look at the form itself, that that's exactly what's going on,

21   "In connection with my application for employment," et cetera,

22   et cetera, et cetera, there's going to be this background

23   check, signature at the bottom.

24        And then one of the issues that plaintiff is raising is

25   that on the form itself -- and it's a one-page form -- there's

1    also these boxes where plaintiff then had to handwrite in the

2    information that would be required to actually run that

3    background check.  Okay.  Well, what's your name, your address,

4    your driver's license, so we can run that information?

5        Now, you could dispute -- and there is an argument that

6    the Court's seen -- as to whether that's itself compliant or

7    not compliant.  But that's not an issue for us to solve today.

8    What is an issue for us to solve today is whether there's been

9    any concrete injury that's alleged as a result of the claimed

10   extra language that's in the form.  Now, I think by having to

11   handwrite in that information right below, it's actually even

12   doubly clear that you're having a background check.  That's why

13   you put that information in there by hand.

14       Where plaintiff has a problem is that then in the

15   complaint, after submitting this, plaintiff says only that

16   there was a statutory violation.  Plaintiff says -- and I'm

17   looking at Paragraph 44 and 45 as an example -- by including

18   additional language, questions, blanks, and disclaimers, in

19   this form right here, Umpqua violated the statute.  Umpqua's

20   disclosure and form was not clear and conspicuous, and did not

21   consist solely of the disclosure that a consumer report may be

22   obtained for employment purposes, and that this violated the

23   statute.  And therefore, plaintiff is entitled to statutory

24   damages.  That's not sufficient.  That's just repeating the

25   statutory language.  And that's actually -- if you look closely

1    at what *Spokeo* did, that's the same conclusion that *Spokeo*

2    draws.

3        So *Spokeo* also dealt with FCRA provisions.  And the

4    plaintiff in that case had alleged that there was problems with

5    the notice that was supplied; that under the different

6    provisions that were cited in that case, that a certification

7    had not been obtained; that the purchaser of the background

8    report was complying with all of these notice requirements; and

9    that a copy of the rights of the consumer was not included

10   along with the background report when it was generated, et

11   cetera.  These are the same types of notice type of procedural

12   provisions.

13       THE COURT:  Well, the *Thomas* court said, in facts

14   very similar, the rights created by Section 1681b(b)(2) are

15   substantive rights, and the breach of the statute is not a bare

16   procedural violation.  That was the first reason given for

17   essentially ruling denying the motion to dismiss.

18       And how do you respond to that?

19       MR. HOWARD:  So Your Honor, I think that's where the

20   *Thomas* court decided to take a shortcut, to be honest, and

21   said, "We're going to call these substantive."

22       THE COURT:  And once you get into the substantive

23   area, you would agree that it would -- if I concluded that it

24   was a substantive violation, then I'd have to deny your motion

25   to dismiss; would you agree with that?

1           MR. HOWARD:  Your Honor, actually, I wouldn't.

2  Because I think, to be honest, that it's a somewhat artificial

3  distinction.  I think you could argue something is procedural,

4  substantive, and some combination, potentially.  I think

5  what --

6           THE COURT:  Hasn't the Eleventh Circuit kind of come

7  out and said these are substantive violations?

8           MR. HOWARD:  I think somewhat, although --

9           THE COURT:  Well, what do you mean "somewhat"?  They

10  actually so held; have they not?

11           MR. HOWARD:  Your Honor, I don't think they've said

12  exactly that in an FCRA case like the kind we have, where

13  there's just a statutory allegation at stake.  But the Eleventh

14  Circuit -- I think it's in the *Ascenda* case --

15           THE COURT:  In the *Church* case.

16           MR. HOWARD:  *Church* case, yes -- does go that

17  direction.  That's a little different, though.  That case

18  involved a notice to consumers that basically collection

19  efforts were going to commence immediately, so that there's a

20  negative effect that's happening to the consumer right away,

21  and that the rights and the things the consumer could do to

22  stop that weren't included along with it.

23      So you often get into the facts.  And I think they're

24  important, because really it isn't so much a substantive

25  procedural distinction.  That's not what, I don't think, *Spokeo*

1    really directs.  What *Spokeo* says is, we have Article III.  And

2    what does Article III say?  Article III says you have to have

3    an injury to be in federal court.  And what we've said in the

4    case law is, it has to be a concrete injury.  That's the test.

5    Now --

6              THE COURT:  But *Spokeo* also said that the injury need

7    not be tangible to be concrete; did it not?

8              MR. HOWARD:  Right.  It did say that.  And the

9    example the Court used was, well, you know, we do have certain

10   cases where, for example, there's this diffuse harm, and

11   Congress has passed a law -- and the example the Court uses is,

12   "You may be entitled to some information."  Congress has said

13   you can get this information.  The government refuses to give

14   it to you.  What are you supposed to do?  Well, you don't know

15   if you've been harmed by not receiving that information,

16   because you don't have it.  The only way to actually know if

17   you have an injury is to get it.  And so in that -- and that's

18   what the Court said.  You know, yes, that's a scenario where

19   that's part of what Congress was setting up.  It's part of that

20   unusual situation where, you know, we're going to allow that to

21   proceed in this way --

22             THE COURT:  How do you -- the *Church* court relies on

23   the *Havens* case, dealing with these fair housing testers that

24   go out and apply to rent some property.  They're not really

25   intending to rent.  They want to see whether they're going to

1    rent to them or not, because they're African-American or

2    whatever, and then the next person comes along and gets the

3    property.

4         And the question there in *Havens* was, was that a

5    violation?  Did they have standing, those white tester

6    plaintiffs, if you will?  And *Havens*, which is a Supreme Court

7    case said, yes, they had standing, even though they never

8    intended to rent the property.

9         How do you -- and the Court in *Havens* explained that the

10   fact that the tester never intended to rent does not negate the

11   simple fact that there was injury under the Fair Housing Act,

12   and they had standing.  What's different here?

13              MR. HOWARD:  Your Honor, I think what's different is

14   what the Supreme Court says in *Spokeo* is, you've got to look at

15   the history of whether we've allowed a type of claim in this

16   setting.  And you also have to look at what is the

17   congressional purpose itself that's being set forth here.  And

18   that's what Judge Coughenour does a nice job of in the *Byles*

19   case is --

20              THE COURT:  You like Judge Coughenour's case, as

21   well?

22              MR. HOWARD:  I do, Your Honor, I have to admit.

23        But he does a good job of taking that and applying that in

24   context.  And I think it's important.  Because if you look in

25   *Spokeo*, it's dealing with these exact type of FCRA provisions.

1   And the Court says, in the context of this particular case, the

2   general principles that we've told you about, tell us two

3   things.  On the one hand, Congress plainly sought to curb the

4   dissemination of false information by adopting procedures

5   designed to decrease that risk.  On the other hand, *Robins*

6   cannot satisfy Article III by alleging a bare procedural

7   violation.  A violation of one of the FCRA's procedural

8   requirements may result in no harm.  For example, even if a

9   consumer reporting agency fails to provide the required notice

10  to a user of the agency's consumer information, that

11  information, regardless, may be entirely accurate --

12          THE COURT:  I've read *Spokeo*.  You don't need to read

13  it to me.

14          MR. HOWARD:  Sorry, Your Honor.

15          THE COURT:  And your time is essentially up.  I've

16  used much of it, I suppose, in asking questions.  But I think

17  your counsel in the other case wishes to be heard, so why don't

18  you wrap up what your position is.

19          MR. HOWARD:  Your Honor, if I can just wrap up, then,

20  I will.  And I apologize for reading the -- part of the opinion

21  to the Court.  I just thought that piece of it really answers

22  the question for us in this case, I think.

23          THE COURT:  Well, you know that you can read *Spokeo*

24  for a long time, and it raises as many questions as it answers.

25  That's why the circuits are split, the district courts are

1    split.  There's a lot of uncertainty about what it means.

2          MR. HOWARD:  I think there's some uncertainty about

3    what it means, but we know what it did with an FCRA claim that

4    included, if anything, more allegations of harm than we have

5    here.  It said, "You haven't connected the dots.  It's not

6    concrete enough.  We're sending this back to the Ninth

7    Circuit."

8          THE COURT:  Well, it sent it back to the Ninth

9    Circuit, but we don't know what the circuit's going to do; do

10   we?  I mean, it's possible that they're going to conclude

11   because the circuit -- as I understand it, when it first was

12   decided, they didn't concentrate on the second part of the --

13   what's a concrete injury.  So they may well decide that there

14   is a concrete injury there.

15         MR. HOWARD:  Your Honor, it's possible, although I

16   think the Ninth Circuit has already kind of raised the issue in

17   one of its cases, where it was talking about -- I think it was

18   a RESPA case.  But it said, well, under *Spokeo*, just not

19   getting sufficient notice, there's a good chance that that

20   isn't sufficient.  That's the *McQuinn vs. Bank of America* case.

21   It says the holding in *Spokeo* calls into question whether

22   violation of -- actually, the Truth in Lending Act's notice

23   requirement, without more, creates an injury that is

24   sufficiently concrete to confer standing.  That's the only

25   guidance I have from the Ninth Circuit that I can point the

Motion Hearing – 10/13/16

```
 1   Court to.

 2        But I will say the Court has some, I think, good guidance

 3   from the Larroque case, out of the Northern District of

 4   California, and the recent Nokchan vs. Lyft case, which really

 5   are on all fours with this scenario.  There's just purely an

 6   allegation of a procedural violation, that somehow the

 7   disclosure form itself included extra information.  And those

 8   courts distinguished Thomas more or less along the lines that I

 9   talked about, and said, "No.  Those are dismissed.  You haven't

10   done the concrete link."

11        I think it's potentially different from the parking case

12   you just had in that I don't know what else plaintiff can say.

13   I'm not sure how the dismissal should proceed, whether it

14   should be with prejudice or without.  But what we have --

15             THE COURT:  All right.  Mr. Howard, I think your time

16   is up.

17             MR. HOWARD:  Thank you, Your Honor.

18             THE COURT:  You've got a very impatient colleague

19   over there that wants to talk about the other case.

20             MR. VANCE:  Thank you, Your Honor.  Joseph Vance, on

21   behalf of Defendant BBSI.

22        While everyone acknowledges that Spokeo leaves some

23   questions unanswered, there are some questions that are

24   answered.  I mean, it gave the example.  Not every violation of

25   FCRA creates a concrete harm.  And it gave an example of that.
```

Motion Hearing – 10/13/16

1    Failure to give notice where the agency –– nonetheless, the

2    information that was provided was entirely accurate, the

3    Supreme Court says there's no concrete harm there.

4        And so in this case here –– so the idea that the notice

5    that was required to be provided by a reporting agency, the

6    Supreme Court itself says that's a procedural violation.

7            THE COURT:  Take a moment to focus on the precise

8    facts here and how it may be different or the same.

9            MR. VANCE:  Yeah.  So the precise facts here are that

10   the disclosure had additional information, including

11   information regarding a release of liability, including

12   additional information regarding other authorization to provide

13   other information.  But it's also undisputed that the very

14   first sentence of the disclosure authorizes BBSI to obtain a

15   consumer report for employment purposes.

16       And what's significant here is that it's undisputed ––

17   there's not a single allegation that the plaintiff didn't

18   understand that the plaintiff was authorizing a consumer report

19   for employment purposes.  There's no allegation that the

20   consumer –– that the plaintiff did not sign the authorization.

21   There's no allegation by the plaintiff that if, in fact, the

22   form was as the plaintiff alleges that the form should have

23   been, that the plaintiff would not have signed the form.

24           THE COURT:  Well, so in this case, the authorization

25   form, wasn't it broader than was necessary?  I mean, it's

Motion Hearing - 10/13/16

1    alleged that the release authorized the defendant to -- the

2    ability to obtain school records that might not otherwise have

3    been permitted.

4              MR. VANCE:  That's the allegation.  And if

5    anything --

6              THE COURT:  Well, I have to assume that's true; don't

7    I?

8              MR. VANCE:  Correct.  But also, then, how was the

9    plaintiff injured or harmed by that?  In other words, the fact

10   that that language was in there, if anything, that would cause

11   the plaintiff to be cautious about signing.

12       So in this case here, they -- that -- there's nothing

13   about that language that would have encouraged the plaintiff to

14   go ahead and sign the authorization.  And that's the whole

15   point of the statute.  The statute -- and again, this case

16   would be totally different if you had a plaintiff that says, "I

17   would not have signed this authorization if this had been in a

18   different form, format."  That's not the allegation.  The

19   allegation is simply, "I'm entitled to damage, because the

20   format was not correct."  And that's what *Spokeo* says you're

21   not allowed to do.  There's no Article III standing with

22   regards to that.

23       If I might, I know that most of our time is over --

24             THE COURT:  I'm going to give you -- and I'll expand

25   the plaintiffs' time.  But so -- take your time.  I mean, it's

1    not clear to me that these are identical kind of cases, but

2    they may be.

3          MR. VANCE:  Frankly, Your Honor, I do think that

4    they're identical type of cases.  I mean, the question is, the

5    fact that you have extraneous -- allegedly extra language, does

6    that create an injury, without showing some particular,

7    concrete harm?

8          I distinguish it from the *Church* case.  I mean, I think

9    the *Church* case is substantially different.  The *Church* case

10   contains a demand letter that's going out to potential debtors,

11   that does not include notice provision with regards to their

12   rights with regards to that.  That's not the situation here.

13   And so I do think that there's a distinction in that.

14         The one --

15         THE COURT:  Well, and the alleged injury here in this

16   complaint is -- I think the operable allegations are in

17   Paragraph 49, which says:  Plaintiff experienced a concrete

18   injury.  I'm going to paraphrase.  She was deprived of a

19   disclosure to which she was statutorily entitled as a failure

20   to comply with the stand-alone disclosure requirement, and

21   defendant invaded her privacy by obtaining a consumer report on

22   her without making an appropriate disclosure and obtaining

23   proper authorization.

24         So I think the statutory failure itself may not be enough.

25   But address the second sentence which alleges that plaintiff's

1    privacy was essentially invaded by obtaining a consumer report

2    without making the necessary disclosures.

3         MR. VANCE:  I think both the recent *Lyft* case, from

4    the District Court in California, as well as the *Caremark/Wood*

5    [sic] case, or the *Wood/Caremark* [sic] case, in Missouri,

6    analyzed that issue.  And the issue is, you don't have a lack

7    of privacy when you knew that you were –– when you knowingly

8    authorized the company to obtain a consumer report.

9         So in this case here, there isn't a lack of privacy.

10   Because even with –– even notwithstanding you didn't get the

11   notice that you claim that you were entitled to, you still knew

12   that BBSI was obtaining the report.  And in fact, there's no

13   allegation that, "I wouldn't have authorized them to obtain the

14   report."

15        And so again, if this was a case where the disclosure

16   language was hidden someplace, or that the plaintiff was

17   confused about it, or if the plaintiff is saying, "I would

18   never have done it if I had known," that might be potentially a

19   privacy case.  But there's no such allegation in this case with

20   regards to that.  And both *Lyft*, *Caremark*, the *Ohio State* case,

21   *Smith vs. Ohio State*, all of those analyzed that and deal with

22   that.

23        Your Honor ––

24        THE COURT:  These *Ohio State* cases kind of dealt with

25   a public entity.  I mean, is that a little different?

 1          MR. VANCE:  I think they're potentially a little

 2    different, but I don't think it's different with regards to

 3    this issue.  I mean, the issue with regards to this was the

 4    same issue in the sense that it was looking at -- it looked at

 5    those privacy cases, and I think it also looked at the

 6    informational arguments that were made.

 7          THE COURT:  If we were sitting in the Eleventh

 8    Circuit, would you lose your motion to dismiss, as a result of

 9    *Church*?

10          MR. VANCE:  Yeah, I would hope that I would be able

11    to convince the Eleventh Circuit that ours is distinguishable

12    from that case, and particularly that I do not see any way that

13    you can call -- if the United States Supreme Court says that

14    failure to give notice to a user is a procedural violation, and

15    it doesn't create any harm as long as the information is

16    entirely accurate, then how is my case a substantive?  How --

17    there's no way that the notice that's -- for sole disclosure is

18    a substantive right and that what the -- *Spokeo* is talking

19    about is a procedural right.  If that's a procedural right,

20    mine's a procedural right.  And you need look at what the

21    actual damage is.

22          THE COURT:  Well, but some procedural rights can give

23    rise to standing.  You agree that *Spokeo* helped -- so helped.

24          MR. VANCE:  Yeah, if you can show that you have

25    injury.

1    So that's why I say in this case if you said, "I didn't

2  get the notice," or the notice was hidden, or it was buried, or

3  it was improper, and there was an allegation that, "I would not

4  have signed this if it had been given to me properly," or, "I

5  did not understand it," and that's why.  They don't say that.

6  And that's what *Spokeo* at the very least is saying with regards

7  to these FCRA, is that if -- where notice is not given, tell me

8  what the damage is, tell me what the injury is.

9          THE COURT:  If I were to agree with your position,

10  would I have to dismiss with leave to amend?

11          MR. VANCE:  I suppose that if they could offer that,

12  there would be an opportunity for them to do that.

13    If I might, I wanted to -- there is one difference between

14  the BBSI and Umpqua that has to do with that issue of dismissal

15  versus remand.  The plaintiff is arguing in our case, because

16  the case was removed from state court, that the proper issue --

17  the proper result would be a remand to state court.  And we've

18  cited the cases that indicate that that's not correct.

19    I'll be honest with the Court --

20          THE COURT:  But the standing -- the Article III

21  standing is an Article III federal court standing requirement.

22    Do the state cases suggest that their standing -- what's

23  necessary for standing would be different?

24          MR. VANCE:  I believe that our argument would be that

25  in -- that Washington, although it's not bound by Article III,

1    that they follow standing jurisprudence that's similar to the

2    standard for Article III, but the bigger --

3              THE COURT:  Do you have a case that says precisely

4    that?

5              MR. VANCE:  I have -- not off the top of my head can

6    I cite to it.  We have cases that would indicate that.

7              THE COURT:  Did your brief contain those cases?

8              MR. VANCE:  I don't know that we cited to those

9    cases, Your Honor.

10        My -- the point that I would make with regards to that,

11   though, is this issue that in this case here, the only case at

12   issue -- the only claim at issue is a claim on a federal

13   statute.  The -- a defendant is entitled to have a claim on

14   federal statute decided in federal court.  And if the result of

15   this is that where a plaintiff does not have a concrete harm,

16   they're nonetheless entitled to pursue that in state court,

17   what it would mean is that a defendant now, notwithstanding

18   that the only claim that's at issue is a federal claim, a

19   federal statute, they would have to defend that case in state

20   court.  So they wouldn't have to defend the case in state court

21   where the plaintiff has actually been injured and has a

22   concrete injury.  They would only have to defend the case in

23   state court where there is a -- where there is no concrete

24   injury.

25              THE COURT:  But the plaintiff cites to a number of

1   cases in their opposition brief which says that Washington

2   courts are not governed by Article III.

3       You didn't respond to any of those cases in your reply;

4   did you?

5           MR. VANCE:  We did not, Your Honor.

6           THE COURT:  So can I assume then that you don't have

7   anything to respond with in that regard?  I mean, they cite --

8   plaintiff cites the *Ullery/Fulleton* case, 162 Wn.App, and other

9   cases, suggesting that the standing -- you know, that this

10  whole *Spokeo* argument is a federal Article III standing problem

11  and isn't going to decide whether the states -- a state court

12  is going to say they can bring the case.

13      I mean, Congress clearly gave the plaintiff -- said it's a

14  violation of the statute and allows statutory damages and

15  attorney's fees; does it not?

16          MR. VANCE:  What I would point the Court to is the

17  *Wood/Caremark* [sic] case in Missouri, the district court

18  case --

19          THE COURT:  Did that case deal with that -- this

20  remand issue?

21          MR. VANCE:  It did, Your Honor.  And what that court

22  held is that there's a difference between judiciability [sic]

23  and the jurisdiction, substantive jurisdiction.  And it says

24  where -- in a case like this, where you don't have -- where you

25  don't have standing, it goes to the judiciability.  And as that

Motion Hearing – 10/13/16

```
1    case acknowledged, and the other cases acknowledged, the courts
2    have not always been clear in distinguishing that.  But where
3    you have a case like this, where it's purely a federal statute,
4    a claim on a federal statute, and the plaintiff does not have a
5    concrete injury, what it goes to -- before you even get to
6    jurisdiction, substantive jurisdiction, you get to the question
7    of judiciability.  And judiciability goes to the issue of does
8    a particular plaintiff have a claim.  It doesn't go to does the
9    Court have jurisdiction over the claim in general.
10            There's no question that the FCRA claim here, the Court
11   has jurisdiction over.  The question is, does that particular
12   plaintiff?  And where the particular plaintiff doesn't, that
13   court ruled that it's a failure to state a claim, and that
14   dismissal is appropriate.
15            THE COURT:  Thank you.
16            MR. VANCE:  Thank you, Your Honor.
17            THE COURT:  Well, they've been going for a half hour,
18   those defendants, so I guess you get a half hour if you want
19   it.
20            MS. DRAKE:  Very well, Your Honor.  Thank you.
21            THE COURT:  Hopefully, you can convince me to the
22   contrary in less than that time.  But take what time you need.
23            MS. DRAKE:  Please let me know when to stop if I've
24   convinced you, because the last thing I want to do is keep
25   going and un-convince you.
```

Motion Hearing – 10/13/16

```
 1          So I'd actually like to start with what I think is at the
 2     root of defendants' argument.  And it goes something like
 3     this -- in fact, Mr. Vance just articulated it very well.  How
 4     can plaintiffs possibly complain that the defendants procured
 5     consumer reports on them when they signed these documents
 6     allowing the defendants to do that?  At the end of the day,
 7     that is defendants' fundamental argument:  How can there
 8     possibly be an invasion of privacy if the plaintiff signed
 9     these documents, and if they don't say, "Well, if the documents
10     had looked the right way, I wouldn't have signed"?
11          THE COURT:  I think their argument is a little
12     different, and that is that you need standing, and you need to
13     allege a concrete injury.  You have alleged a statutory
14     violation.  You have not alleged, I think, anything else.
15          MS. DRAKE:  I would -- we have alleged a statutory
16     violation, and I would argue that that entails a concrete
17     injury, and here's why.  The default rule is that consumer
18     reports are private.  The Fair Credit Reporting Act supplanted
19     the common law.  It says you can't sue for common law invasion
20     of privacy anymore when it involves a consumer report.  Your
21     recourse is under the Fair Credit Reporting Act.  No one can
22     get a consumer report on anyone else unless they have a
23     permissible purpose under the Fair Credit Reporting Act.
24          THE COURT:  And applying for a job, is that a
25     permissible purpose?
```

Motion Hearing - 10/13/16

1           MS. DRAKE:  Under the Fair Credit Reporting Act,
2    there are two things that allow an employer to procure a
3    report.  They have to have made a stand-alone disclosure, and
4    they have to have received authorization to procure the report
5    in writing.
6           It's important, Your Honor, in the employment context, the
7    Fair Credit Reporting Act is different than in many other
8    contexts.  So if I go to a bank and apply for a loan, for
9    example, the bank can just get my credit report.  I don't have
10   to authorize anything.  They don't have to tell me anything.
11   They automatically have that right by virtue of the fact that I
12   applied for a loan.  That's what the Fair Credit Reporting Act
13   says.
14          In the employment context, there are additional
15   requirements.  And it's a requirement of informed consent.  The
16   employer has to make a particular disclosure to the consumer,
17   "We are going to procure a consumer report on you for
18   employment purposes."
19          THE COURT:  What's the difference with -- whether you
20   have one document that the person signs, that has both the
21   consent and the disclosure, or two documents, and you separate
22   it out?  I mean, could the defendants, both of these
23   defendants, have given the applicant two pieces of paper and
24   complied with the statute?
25          MS. DRAKE:  Well, Your Honor, the statute explicitly

1    allows the disclosure and the authorization to be in the same

2    document.  That's not what plaintiffs are complaining about.

3    What the statute does not allow is anything else, such as a

4    liability release; a broad release of information to third

5    parties, which in this case, as to both defendants, covered

6    records that are otherwise protected from disclosure:  School

7    records; financial records; medical records.  The defendants

8    put everything, the whole kit and caboodle, into this one form.

9    And so when the Court says, you know, what's the difference if

10   it's one document or two documents, my response would be,

11   Congress said that there is a difference, and the reason is

12   because Congress wanted informed consent.

13        Defendants' documents, right, they say, "Look, it's still

14   one page" --

15            THE COURT:  Congress said that you shouldn't have the

16   expiration date of your credit card on the receipt.  I mean,

17   they said a lot of things in the Fair Credit Reporting Act that

18   are procedural violations.

19        But the question is, do you allege a concrete injury?

20            MS. DRAKE:  They're different, Your Honor.  There's

21   nothing in the legislative history of the FACTA credit card

22   truncation to indicate that Congress was concerned about

23   privacy, in and of itself.  The whole congressional record is

24   identity theft, is there a risk of identity theft; okay?

25        So earlier, when the plaintiffs in that FACTA case were

Motion Hearing - 10/13/16

1    arguing, they were saying, "Look, there's an increased risk of
2    tangible harm," namely identity theft.  That's not my argument.
3        The harm here is that defendants procured reports on our
4    clients when they had no legal right to do so.  The only way
5    that they get a right to procure this information -- the
6    default is that it's private, that they don't get it -- is if
7    they obtain informed consent.  Here, they didn't do that.  They
8    published documents that have all kinds of other information in
9    them, that conflate what the consent is to.  Umpqua's form
10   doesn't even name Umpqua on it.  I mean, they say, "Oh, the
11   plaintiff signed this document."
12       Here's the document that the plaintiff in Umpqua signed.
13   Umpqua is not even named.  Here, it starts off, the document
14   that's supposed to create informed consent, "We're going to get
15   your consumer report.  Please authorize us to do that."  That's
16   all it's supposed to say.  It starts off by telling the
17   plaintiff, in teeny, tiny little print, "Anyone who obtains
18   information on a consumer, from a consumer reporting agency,
19   under false pretenses shall be fined not more than $2,500."
20       What does a layperson think when they start thinking about
21   fines of $2,500?  The Court sent out class notices and had
22   inquiries from class members, or dealt with laypeople who don't
23   understand legal disclosures.  They don't go, "Oh, wait.  That
24   only applies if they get a report on me without" -- they go,
25   "$2,500 fine, that sounds scary.  What is this thing?"  And

Motion Hearing – 10/13/16

1   then it says, "Oh, and you release us from all liability, and

2   we can get all this information from over here, and we can get

3   all this information from over there."

4        Congress said that's not good enough.  This is very

5   private information.  This isn't the expiration date on your

6   credit card.  This is your Social Security number, your credit

7   history, your employment history, your criminal background,

8   drug and alcohol test results from defendants' form.  The

9   default is, this is private, and employers can only get it when

10  they get informed consent.  That means providing clear and

11  conspicuous stand-alone disclosure, and get authorization in

12  writing.

13       And the idea of informed consent, or consent that has to

14  look a certain way, isn't foreign, and it's not procedural.

15  Take the statute of frauds, Your Honor.  What if I came into

16  court and I said, "In the hallway before court today, Mr. Vance

17  agreed to sell me his home for $3 in the next five minutes.

18  And he didn't do it, so I'd like you to enforce that

19  agreement."  You'd say, "Ms. Drake, that's crazy.  Those kinds

20  of agreements have to be in writing."  And I'd say, "Oh, it's

21  just procedural, Your Honor.  He agreed.  He admits he agreed.

22  Three bucks, I get his whole house.  Enforce it."  You'd say,

23  "No.  That kind of consent is not valid in court."  And that's

24  a common law that's not valid.

25       So the idea that Congress now can't circumscribe the

Motion Hearing – 10/13/16

1    particular circumstances in which consent has to occur, of

2    course they can.  That's why Judge Payne, in *Thomas*, said this

3    is a substantive right.  It's why the Eleventh Circuit said the

4    right to receive this information is substantive.  I'd

5    encourage the Court to look at the Third Circuit's opinion in

6    *In Re Nickelodeon.*

7           THE COURT:  Oh, I read it.

8           MS. DRAKE:  That's a very favorable case for us.  The

9    Third Circuit said the violation here is obtaining this

10    information in circumstances when you did not have a legal

11    right to do so.  That's all the video privacy protection act is

12    about.

13           THE COURT:  Well, the *Nickelodeon* case is so far

14    removed, I think, from this case.  I mean, there, there was the

15    internet cookie technology and information about the kids'

16    browsers you could -- I mean, if I had those facts, you'd be --

17    I'd ask you to sit down, and I'd rule in your favor.  But I

18    think that's a case that's got its own particular facts, and I

19    don't think it particularly informs the Court, doesn't inform

20    me on what I should do here.

21           MS. DRAKE:  I think that the facts there are more

22    sympathetic, but the principle is the same, which is that,

23    remember, Article III is about separation of powers; right?

24    The whole point is to not involve courts in decisions that are

25    best left for other branches.  So the Court can't make a

Motion Hearing – 10/13/16

1    principled decision in saying, "Well, of course Congress has

2    the right to decide that you can't have video-related

3    information if that involves minors and cookies, because that's

4    creepy."  No.  Congress can either say you get this

5    information, or you don't.  And that is an appropriate

6    congressional decision.

7         I would also encourage the Court to look at the case that

8    the Eighth Circuit issued.  Actually, both Eighth Circuit cases

9    I think are favorable to plaintiffs.  The first is the

10   *Braitberg* opinion, *Braitberg vs.* -- I believe it's *Charter*.

11             THE COURT:  That's the Cable Communication Policy Act

12   case.

13             MS. DRAKE:  It is.  And in that case, what the Court

14   said is this:  There's no standing, because there's no question

15   that *Charter* had a right to have this information.  The

16   violation is simply that *Charter* kept the information for too

17   long.  But that language in the *Braitberg* opinion, about the

18   fact that *Charter* had a legal right to the information in the

19   first instance, is beneficial to plaintiffs.  Because here,

20   defendants don't.

21        Remember, Your Honor, the violation that plaintiffs allege

22   is not just getting the wrong form.  The violation is only

23   complete when defendants go on and get plaintiff's consumer

24   reports.  It's that they didn't have a right to the

25   information, because they didn't obtain informed consent.

Motion Hearing – 10/13/16

1     And the very next day, after *Braitberg* –– the defendants

2   were so excited about *Braitberg*.  They all viewed it as

3   favorable to them.  I think in this context, it's favorable to

4   us.  But the very next day, the Court issued another opinion,

5   which is even better for plaintiffs, *Farmers vs. EPA*.  That was

6   a reverse Freedom of Information Act claim.  And there, the

7   Farmers Association sued the Environmental Protection Agency

8   for releasing their names and addresses in response to a FOIA

9   request.  They said, "Wait a minute.  That's private

10   information.  You can't release that in response to a FOIA

11   request.  We're suing you.  It's statutorily protected."

12          THE COURT:  Now, is that cited in your brief?  That's

13   one case I'm not familiar with.

14          MS. DRAKE:  Yes, Your Honor.

15          THE COURT:  I read a lot of cases.

16          MS. DRAKE:  We submitted it in our second notice of

17   supplemental authority, on September 14.  And the case number

18   is 15-1234.

19          THE COURT:  But it's your second supplemental –– all

20   right.  We'll find it.

21          MS. DRAKE:  That's correct.  It's the second

22   supplemental authority in the BBSI case, Your Honor, in

23   Dougherty.

24     But there –– so the EPA says, "How can you possibly

25   complain?  How can you possibly have standing?  If we released

1   your name and your address and your -- that kind of banal

2   information, that's already out there.  Anybody can get your

3   name and address."  The Eighth Circuit, probably the most

4   conservative circuit court in the country, said "standing."

5   That information was statutorily protected from disclosure.

6       Privacy injuries, they are the quintessential and tangible

7   harm that the court was talking about in *Spokeo*.  There's no

8   way to invade somebody's privacy other than by just obtaining

9   information about them that you don't have a right to get.  And

10  we can't start, in court, under the guise of a constitutional

11  provision aimed at protecting the separation of powers, to say

12  "Well, Congress said you have to get informed consent."

13  Congress said you have to give this kind of information, and

14  you have to get written authorization.  We can't then back off

15  that and say, "Well, you know what, just written authorization

16  alone, that's enough."  That's the substantive part.  The

17  provision of the information, that's just procedural.

18      What if defendants had come in and said, "You know what,

19  Your Honor, we don't have written authorization, but

20  Mrs. Dougherty called us on the phone and said we could get it.

21  Plaintiffs don't have standing."  Would that -- would then the

22  written authorization requirement just be procedural?  Of

23  course not.  You can't, under the guise of Article III,

24  defendants can't, and this Court should not, start walking back

25  off of Congress's ability to specify the circumstances in which

Motion Hearing – 10/13/16

1     one party can obtain private information about someone else.

2          And it's not new or foreign that this information is

3     private.  Plaintiffs cited a Supreme Court case, *Department of*

4     *Justice vs. The Reporters Committee*.  It's 489 US 749, 1989.

5     That's a 1989 case that's about the fact that compilations of

6     information on individuals, even when all the information

7     itself is already public, are still entitled to privacy

8     protection.

9          So remember, what defendants did here is, they procured

10    information that is indisputably private.  The only way they

11    get a right to that information is through the Fair Credit

12    Reporting Act.  And what they want to argue is, "Well, we get

13    that it's private, and we also admit" -- counsel for Umpqua

14    admitted his form doesn't comply.  The Court's already ruled on

15    the motion to dismiss that plaintiffs have stated a claim --

16    "Yeah, we didn't comply with the statute" --

17          THE COURT:  That case has been around for a long,

18    long time.  I think it's on -- anyway, it's an old case.

19    You're right.

20          MS. DRAKE:  Yeah.  So, you know, they want to say,

21    well, yeah, the information is protected.  It's private.  The

22    only way we can get it is through compliance with the statute,

23    but we don't really have to totally comply with the statute.

24    If we, like, get close, that's good enough.  So just go with

25    the written authorization part, Your Honor.  We don't really

Motion Hearing – 10/13/16

1    have to provide the information the statute says we also have
2    to provide.  Any old consent is good enough.  Don't worry about
3    whether it's informed consent.  We think we informed them
4    enough.  We think our form is good enough.  You should do that
5    too, and you should do it as a constitutional matter.  No.
6    That is Congress's purview.
7          And that's what the Eleventh Circuit was getting at, in
8    *Church vs. Accretive Health*.  That's why this case is valuable
9    to plaintiffs.  *Church* was a Fair Debt Collection Practices Act
10   case, where the Fair Debt Collection Practices Act specified
11   that consumers are entitled to receive certain information in
12   connection with communications regarding the collection of a
13   debt.  All the plaintiffs in that case had to demonstrate is
14   that they didn't get the information they were entitled to.
15   They didn't have to show that it hurt them in some way that
16   they didn't get the information.  They didn't have to show that
17   they paid the debt when they otherwise would not have paid the
18   debt.  They didn't have to show any of that.  That is the
19   quintessential instance in which simply not receiving
20   information that Congress said it's important for a consumer to
21   receive was sufficient.
22         *Havens*, the case that the Court brought up earlier, is a
23   perfect example, highly analogous to the present circumstance.
24   In fact, I would argue our facts are better than *Havens*; right?
25   In *Havens*, these people go out, and they say, "We're going to

1    test."  Right?  "We want to see if these landlords are

2    violating the Fair Housing Act.  They're supposed to give

3    African-Americans certain kinds of information when we apply

4    for housing.  We're going to go see if they give it to us."

5    Lo-and-behold, the landlords didn't.  Those individuals had no

6    intention of actually living in those buildings.  But the Court

7    found that even they still -- they didn't even want the

8    information, or need it, and they still had standing.

9            Here --

10               THE COURT:  That was before *Spokeo*.

11          Do you think the result would be the same?

12               MS. DRAKE:  I do.  I do think it would be the same.

13    In fact, part of the reason I think it would be the same is

14    because in *Spokeo*, the Supreme Court cited to two other

15    informational injury cases, *Federal Election Commission vs.*

16    *Akins* and *Public Citizen vs.* -- I believe it's the *American Bar*

17    *Association*.

18          In both of those cases, the plaintiffs had sued, saying,

19    "Hey, we made Freedom of Information Act requests, and you

20    didn't give us everything that we're entitled to.  The

21    violation, the injury, they were the same; right?  We just

22    didn't get information we were entitled to."  They didn't have

23    to show it hurt them.  They didn't have to say, "Oh, and if I

24    had gotten the information, I would have made more money," or,

25    "If I would have gotten the information, I would have voted

1    differently."

2         There are all kinds of intangible harms that matter;

3    right?  The *Voting Rights Act* case, if I'm denied the right to

4    vote, do I have to show that my vote would have been the

5    decisive one?  Of course not.  That's not what an intangible

6    right means.  And that's, frankly, what's wrong with the line

7    of opinions in these stand-alone disclosure cases that have

8    deviated from *Thomas*.  You have three cases, *Thomas vs. FTS*,

9    out of the Eastern District of Virginia; *Moody vs. Ascenda*, out

10   of the Middle District of Florida; and *Meza vs. Verizon*, out of

11   the Eastern District of California.  The latter two were both

12   cited to the Court in notices of supplemental authority filed

13   by both my client -- clients in both cases, Umpqua and BBSI.

14        In those cases, the *Meza* case and the *Ascenda* case, the

15   courts follow *Thomas*.  And they say the reason that cases like

16   *Smith vs. Ohio State* are wrong is because they don't recognize

17   the nature of what a privacy right is.  When someone takes

18   something about me, information about me, that they don't have

19   a right to have, that statutory violation and the injury are

20   one and the same.

21             THE COURT:  Do they have a right to have it if you

22   consent?

23             MS. DRAKE:  Only if I consent in the right way.  And

24   that's why I think the statute of frauds is so important here.

25   Because just like at common law, there were certain

1  circumstances where we say, you know, that's got to be in

2  writing; where we say, you know what, if you're a minor, you

3  just can't; if you're intoxicated, you just can't.  A criminal

4  defendant who gives a voluntary statement but isn't Mirandized,

5  that's the analogy here.  Well, he gave the statement

6  voluntarily.  He didn't say, "Well, if I had gotten my *Miranda*

7  rights, I wouldn't have talked."  No.  The end.

8      Congress has a right to make those same kinds of

9  bright-line distinctions.  If you want this private and

10  potentially damaging information -- both of our plaintiffs

11  weren't hired as a result of the information on their consumer

12  reports.  If you want that kind of information about a human

13  being, you have to get informed consent.  You don't get to just

14  say, "Well, I think it's good enough, because it's in writing,

15  even though I didn't give the information," or, "Well, I gave

16  the information.  Look, right here, it's on this form,

17  sandwiched in between some language about a $2,500 fine and

18  some other language releasing me from all liability for

19  anything that I might ever do with the information."

20          THE COURT:  A little slower.

21          MS. DRAKE:  I apologize.

22          THE COURT:  So where do you -- you allege that the

23  concrete injury is the statutory violation.

24      Do you -- and you say they invaded plaintiffs' privacy

25  without making an appropriate disclosure and obtaining the

1    proper authorization.

2        Is that enough?

3        MS. DRAKE:  I think it's certainly enough, Your

4    Honor.  I don't want to revisit the question of, you know,

5    what's the standard on a motion to dismiss for lack of subject

6    matter jurisdiction.

7        THE COURT:  I don't think you need to do that.

8        MS. DRAKE:  But I don't believe that plaintiffs have

9    the same obligation, on a motion to dismiss for lack of subject

10   matter jurisdiction, to plead the injury with particularity

11   that they do under an *Iqbal/Twombly* analysis to plead the

12   actual violation.  I also don't really know how else you plead

13   invasion of privacy, other than by saying, "You got my

14   information when you didn't have the right kind of

15   authorization to get it."  I mean, I could say that in 25

16   sentences, instead of one.  And should the Court find that

17   that's required, I will.

18   For example, the Court in the *Moody vs. Ascenda* case,

19   which I just cited to you, out of the Southern District of

20   Florida, that is a case that is in plaintiffs' favor.  It's a

21   stand-alone employment case, the same kind of violation.

22   Initially, the Court held that plaintiffs didn't have enough,

23   because they hadn't specifically said in their complaint

24   "informational injury and invasion of privacy."  The plaintiffs

25   then amended their complaint and said "informational injury,

Motion Hearing – 10/13/16

1    invasion of privacy," and the Court ruled in their favor.

2         So if there's more, sort of, meat on why this was an

3    invasion of privacy, along the lines of what I've articulated

4    today, we would certainly be happy to amend.  But I think that

5    to the extent the Court can make reasonable inferences, it's

6    clear what we're saying.  What we're saying is, this consent

7    isn't good enough.  It's not the right kind of consent.

8         Congress retains the ability to say when someone can get

9    private information about someone else.  They said you can only

10   do it if you get informed consent.  It's an ancient concept.

11   Defendants didn't do that here.  And it's up to Congress to say

12   what's good enough.  Their forms weren't good enough.  That's

13   why courts have been adjudicating these cases for decades.

14   Your Honor adjudicated it.

15        THE COURT:  I think I understand your argument.

16   Thank you.

17        All right.  I'm going to take the matter under advisement.

18   I'm not going to rule from the bench.  I think this is

19   different than the earlier case where I did rule.  I think it

20   presents a challenging issue, and we'll issue an order as soon

21   as we can.

22        Thank you for your arguments --

23        MS. DRAKE:  Thank you, Your Honor.

24        THE COURT:  -- and your briefs.  And we'll be in

25   recess.

Motion Hearing – 10/13/16

1        Have a nice day, folks.

2                        (Adjourned)

3                (End of requested transcript)

4                      *   *   *

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above matter.

7

8   Date:  1/3/17                    /s/ Andrea Ramirez

9                        _____

10                       Signature of Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25